# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ML Strategies, LLC, )<br>)<br>    Plaintiff, )<br>)<br>    v. )<br>)<br>The Noisette Company, LLC )<br>d/b/a Noisette Company, )<br>)<br>    Defendant. )<br>) | Civil Action No. 04-10641-RCL |

**ML STRATEGIES, LLC'S OPPOSITION TO THE NOISETTE COMPANY, LLC'S
MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION PURSUANT TO
RULE 12(b)(2) OR IN THE ALTERNATIVE FOR *FORUM NON CONVENIENS***

David E. Lurie, BBO# 542030
Sara A. Laroche, BBO# 652479
LURIE & KRUPP, LLP
One McKinley Square
Boston, MA 02109
(617) 367-1970

Dated:  May 6, 2004

**TABLE OF CONTENTS**

INTRODUCTION ................................................................... 1

FACTS.............................................................................. 1

    Noisette's Solicitation of ML Strategies in Massachusetts...................... 1

    Execution of the Engagement Letter in Massachusetts.......................... 2

    ML Strategies' Work on the Project in Massachusetts..........................4

    Noisette's Contacts With Massachusetts...................................... 4

    Noisette's Breach of Contract and Bad Faith Conduct in Failing to
    Pay the Performance Bonus Owed to ML Strategies .............................5

    Noisette's Bad Faith Filing of a Declaratory Judgment Action
    In South Carolina ...........................................................7

ARGUMENT ........................................................................8

I.   THE COURT HAS PERSONAL JURISDICTION OVER NOISETTE
    UNDER THE MASSACHUSETTS LONG-ARM STATUTE
    BECAUSE NOISETTE "TRANSACTED BUSINESS" WITHIN
    MASSACHUSETTS .................................................................. 8

II.  ASSERTING PERSONAL JURISDICTION OVER NOISETTE IS
    CONSISTENT WITH DUE PROCESS CONSIDERATIONS ................ 14

    A. ML Strategies' Claims Directly Relate To And Arise From
        Noisette's Contacts With Massachusetts ......................................14

    B. Noisette Purposefully Directed Its Activities Toward Massachusetts
        Such That It Was Foreseeable That Noisette's Failure To Pay The
        Performance Bonus Would Cause It To Be Sued In Massachusetts....... 15

    C. Asserting Personal Jurisdiction Over Noisette Is Reasonable
        In Light Of The Gestalt Factors............................................. 17

III. NOISETTE HAS FAILED TO SHOW THAT A DISMISSAL UPON
    GROUNDS OF *FORUM NON CONVENIENS* IS APPROPRIATE...........19

CONCLUSION .................................................................... 21

## INTRODUCTION

The plaintiff ML Strategies, LLC ("ML Strategies") hereby opposes the defendant The Noisette Company, LLC's ("Noisette") Motion to Dismiss for Lack of Personal Jurisdiction Pursuant to Rule 12(b)(2) or in the Alternative for *Forum Non Conveniens*. The motion should be denied because there exist a plethora of contacts by Noisette with Massachusetts that are more than sufficient to meet the requirements of the Massachusetts Long Arm Statute and constitutional due process. In hiring ML Strategies to assist its efforts to redevelop a naval base in South Carolina, Noisette solicited ML Strategies in Massachusetts and entered into an Engagement Letter that was signed in Massachusetts. During the course of the Engagement, representatives of Noisette communicated with ML Strategies in Massachusetts for more than a year by telephone, fax, email, and correspondence, traveled to Massachusetts for a meeting, and made repeated payments to Massachusetts. ML Strategies performed its work on the Engagement largely in Massachusetts, and the witnesses relevant to the key issue in this case – the interpretation of the Engagement Letter – are located in Massachusetts. There is no reason why ML Strategies should be deprived of pursuing this collection action in Massachusetts, the forum of its choice where its principal place of business is located.

In support of this Opposition, ML Strategies submits herewith the Affidavits of Anthony G. Marken ("Marken Aff."), David K. Shapiro ("Shapiro Aff."), Peter A. Biagetti ("Biagetti Aff."), and David E. Lurie ("Lurie Aff."), along with a volume of Exhibits referenced by all of the Affidavits.

## FACTS

### Noisette's Solicitation of ML Strategies in Massachusetts

ML Strategies is a strategic consulting company specializing in, among other things, redevelopment of military bases. Its principal place of business is in Boston, Massachusetts.

Marken Aff. ¶¶ 2-3. Noisette is an entity created to redevelop the Charleston Naval Shipyard in North Charleston, South Carolina (the "Project"). In January 2002, Noisette approached ML Strategies in pursuit of redevelopment rights for the Project. Id. ¶ 5. Noisette was interested in obtaining strategic consulting services from ML Strategies and utilizing the substantial experience, expertise, and connections possessed by ML Strategies and Anthony Marken, its Vice President-Military Installations, regarding the redevelopment of military bases. Id. ¶¶ 3-4, 6. Noisette solicited ML Strategies in Massachusetts first by a phone call using an intermediary and then by repeated phone calls directly with Marken in Massachusetts. Id. ¶¶ 7-9, 11. Noisette's then-Chief Financial Officer Roger Noyes explained to Marken that Noisette had a strained relationship with the state redevelopment agency ("RDA") on the Project and needed assistance in facilitating communications with the RDA. Id. ¶¶ 7-8. Noisette hired ML Strategies in part because of Marken's existing relationship with Jack Sprott, Executive Director of the RDA. Id. ¶ 8.

### Execution of The Engagement Letter in Massachusetts

Marken discussed the engagement by Noisette (the "Engagement") with David Shapiro, ML Strategies' Vice President, who also has expertise in redevelopment of military bases. Marken Aff. ¶ 10; Shapiro Aff. ¶ 3. Both Marken and Shapiro work in ML Strategies' Boston office. Marken Aff. ¶ 2; Shapiro Aff. ¶ 2. In a telephone call with Noyes from his Boston office, Marken proposed a fee of $20,000 per month plus expenses, which was a normal fee for an ML Strategies engagement of this scope. Marken Aff. ¶ 12; Shapiro Aff. ¶ 4. Noyes responded by stating that Noisette did not have the cash to fund such a monthly fee, and proposed instead a reduced monthly fee plus a success fee. Marken Aff. ¶ 12. Although ML Strategies rarely agreed to accept deferred or success fees, in order to accommodate Noisette's cash situation it agreed to a performance bonus ("Performance Bonus") of $250,000 in exchange for reduction of

2

its usual monthly consulting fee to $10,000 per month. Id.; Shapiro Aff. ¶ 4. Noisette

represented that it would not have cash to fund the Performance Bonus until it received the

property involved in the Project, as it had no other source of funds other than its investors. In

reliance on these representations, ML Strategies further agreed that the timing of the payment of

the Performance Bonus would be negotiated with Noisette at a future time. Marken Aff. ¶ 12.

Shapiro and Marken drafted an engagement letter in their Boston office ("Engagement

Letter", attached as Exhibit C) dated February 14, 2002 reflecting the parties' agreement.

Marken Aff. ¶ 10; Shapiro Aff. ¶ 4. They signed the Engagement Letter in Boston and sent it to

Noisette in South Carolina. Marken Aff. ¶ 13; Shapiro Aff. ¶ 4. Noyes and Knott signed the

Engagement Letter and returned it to ML Strategies in Boston. Marken Aff. ¶ 14. Noisette

knew that ML Strategies' consulting services would be performed largely in Boston by Boston-

based staff members including Marken. Id. ¶¶ 14-15, 56.

The term of the Engagement was one year starting on April 1, 2002. In its Scope of

Services section, the Engagement Letter states: "During the first sixty (60) days of this

engagement, [ML Strategies] will assist Noisette in (i) creating an action plan for the execution

of a land disposition agreement by December 31, 2002, and (ii) identify any expected or

potential development issues." Exhibit C at 1. In its Compensation section, the Engagement

Letter states:

> [U]pon the successful execution of a land disposition plan negotiated between
> Noisette and the City of North Charleston pursuant to this engagement letter, on
> or before January 1, 2003, [ML Srategies] shall be paid a performance bonus in an
> amount equal to two hundred-fifty thousand dollars ($250,000). . . . Said
> performance bonuses shall be payable on a schedule that [ML Srategies] and
> Noisette will subsequently determine.

Id. at 2. Arrangements for wiring the initial payment were made by telephone conversations and

fax between Marken in Boston and Noisette, and Noisette then wired the monies to an account at

Fleet Bank of Massachusetts, N.A. in the name of Mintz, Levin, Cohn, Ferris, Glovsky and

Popeo, P.C. ("Mintz Levin"), the Boston law firm with which ML Strategies is affiliated. Marken Aff. ¶ 17.

### ML Strategies' Work on the Project in Massachusetts

Marken became an integral part of the Noisette development team and consulted with Noisette often on a daily basis regarding anticipated and new substantive issues affecting the Project. Id. ¶¶ 18-19. He performed the consulting services mostly in his office in Boston, where he would regularly meet with Shapiro to plan strategy. Id. ¶ 20; Shapiro Aff. ¶ 5. While Marken attended various meetings in South Carolina, Georgia (one meeting), and Washington, D.C. as part of the Engagement, his base of operations was in Boston. His computer, secretary, case files, and reference materials were located in Boston, and he utilized all of them extensively as part of the Engagement. He communicated regularly with Noisette as well as with third parties by telephone, email, fax, and letters in his office in Boston regarding substantive issues on the Project. Marken Aff. ¶¶ 20-25. Samples of correspondence/memos, emails, and notes of telephone conversations generated by Marken in his Boston office are attached as Exhibits E, F, and G respectively.[1] Marken met with Knott in Boston in the fall of 2002 and discussed the status of the Project and the next steps to be taken. Id. ¶ 26. Marken also sent Noisette monthly bills out of his office in Boston. Id. ¶ 27.

### Noisette's Contacts With Massachusetts

Noisette's direct contacts with ML Strategies in Massachusetts during the Engagement were substantial and numerous. The contacts concerned substantive matters relating to the Project and continued from April 2002 through June 2003 and beyond. In addition to the

---

[1] Most of Marken's telephone calls with Noisette took place in his Boston office using his office phone, rather than outside his Boston office using his cell phone. Id. ¶¶ 24-25. While he did talk to Noisette officials on his cell phone when he was out of his Boston office, more often than not he was still in Massachusetts during such calls, e.g. while driving between work and his home in Dover, Massachusetts or when catching a plane at Logan airport in Boston. Id. ¶ 25.

contacts described above, Noisette's direct contacts with Massachusetts included many letters and

faxes as well as more than sixty-one (61) emails to Massachusetts. Id. ¶¶ 28(a)-(c); sample

letters, emails, and faxes attached as Exhibits J, K and L, respectively. Noisette participated in

telephone conversations to Massachusetts an average of three times a week. Id. ¶ 28(d); sample

notes of telephone conversations attached as Exhibit G. Noisette made payments to

Massachusetts from March 2002 through July 2003 that were deposited in a Massachusetts bank.

Id. ¶ 28(e); checks attached as Exhibit M. Noisette's Chief Executive Officer, John Knott,

traveled to Massachusetts in the fall of 2002 and met with Marken in Massachusetts to discuss the

Project. Id. ¶ 28(f).

Noisette also regularly contacted ML Strategies in Massachusetts through its lawyers and

consultants. Id. ¶ 29; eighteen (18) sample emails attached as Exhibit N.

### Noisette's Breach of Contract and Bad Faith Conduct
### In Failing To Pay The Performance Bonus Owed To ML Strategies

ML Strategies' key contributions to the success of the Project were repeatedly recognized

by Noisette. Id. ¶ 30; congratulatory memos and emails attached as Exhibit O. As a result of the

substantial assistance rendered by ML Strategies, Noisette was able to negotiate and execute a

Purchase and Sale Agreement with the City of North Charleston prior to the end of 2002. Id.

¶ 31, Exhibit P. Reaching this milestone meant that ML Strategies had earned its Performance

Bonus under the Engagement Letter. Id. ¶ 32; Shapiro Aff. ¶ 6.

Starting in early 2003, Noisette claimed to lack the cash needed to pay ML Strategies'

monthly fees on a timely basis, but represented that it would pay all amounts owed to ML

Strategies, including the Performance Bonus, on or after closing the transaction. Marken Aff.

¶ 33; email from Knott to Marken dated March 14, 2003 attached as Exhibit Q (stating that "[a]ll

bills will be fully paid at settlement or within 2 days after" and that "[y]our performance fee . . .

will be paid over time from payments that we make to the City"). Noisette requested that ML

Strategies continue to provide consulting services beyond the expiration of the initial term of the Engagement on April 1, 2003. ML Strategies relied on these representations and continued to provide services on the Project into June 2003. Id. ¶¶ 33-36.

The transaction closed on or about July 7, 2003. Noisette paid all outstanding ML Strategies' invoices for monthly fees and costs, but failed to pay any portion of the Performance Bonus. Id. ¶ 38. On or about July 31, 2003, Noisette agreed that it would pay $125,000 of the Performance Bonus on or before September 1, 2003, and would pay the remaining $125,000 to ML Strategies upon the final transfer of the remaining land from the Navy to the City. Id. ¶ 39; Shapiro Aff. ¶ 7. Noisette, however, failed to make the $125,000 payment by September 1. Noisette acknowledged that "the performance payment of $125,000 is in principle understood, we still do not have a firm date or process with the City to accomplish." Marken Aff. ¶ 41; September 15, 2003 email from Knott attached as Exhibit U.

Noisette then attempted to impose a new condition for payment of the Performance Bonus that was not part of the parties' bargain, i.e., that ML Strategies continue to provide services to Noisette at a substantial discount from the $10,000 monthly rate set forth in the Engagement Letter (which rate was substantially discounted from ML Strategies' usual rate in exchange for the Performance Bonus). Id. ¶¶ 43-44; Shapiro Aff. ¶ 10. Noisette repeatedly acknowledged in telephone conversations that it owed ML Strategies the Performance Bonus, that ML Strategies had performed well under the initial Engagement, and that it wanted ML Strategies to continue working on the Project, but refused to commit to any payment schedule for any portion of the Performance Bonus. Marken Aff. ¶¶ 43-45; Shapiro Aff. ¶¶ 11-12.

Having received no payment of the Performance Bonus or any written commitment regarding the schedule on which it would be paid, by letter dated January 15, 2004 ML Strategies sent Noisette an invoice for the Performance Bonus and requested payment within ten days.

6

Marken Aff. ¶ 46.

## Noisette's Bad Faith Filing Of A
## Declaratory Judgment Action In South Carolina

By letter dated March 19, 2004, Peter Biagetti, Managing Director – Firm Management

for Mintz Levin, demanded payment of the Performance Bonus within seven days or the matter

would be referred to outside counsel. Biagetti Aff. ¶ 2, Exhibit X. By letter dated March 24,

2004, Noisette's attorney, W. Andrew Gowder, Jr., responded and asserted for the first time that

the Performance Bonus was not earned by ML Strategies because the property to be redeveloped

was not actually transferred or conveyed from the City to Noisette prior to December 31, 2002.

Id. On March 24, 2004, Gowder called Biagetti in Boston and reiterated Noisette's newly-

contrived position that the Performance Bonus was due only if the property was transferred or

conveyed by the end of 2002. Biagetti responded that it was likely that ML Strategies would

prepare and send to Noisette a draft Complaint with one last chance to pay before suit was filed.

Id. ¶ 3.

By letter dated March 29, 2004, David E. Lurie of Lurie & Krupp, LLP, ML Strategies'

outside counsel in Boston, demanded payment of $125,000 of the Performance Bonus by March

31, 2004, and the remaining $125,000 upon transfer of the remaining property to Noisette or by

June 30, 2004, whichever was earlier. Lurie Aff. ¶ 2, Exhibit Y. Gowder called him and said

Noisette could not pay the $125,000 demanded by March 31, 2004, but would be willing to

discuss payment of a significant sum in a 12-18 month time frame. Lurie responded by leaving a

voicemail for Gowder that ML Strategies needed $125,000 paid by April 2, 2004, the end of its

fiscal year, as a sign of good faith, with a payment plan for the remaining $125,000, and that

otherwise his instructions were to proceed to collect the debt. Id. ¶ 3. By letter dated March 30,

2004, Gowder replied to Lurie that Noisette was unwilling to make a payment by April 2, 2004,

but was "willing to agree to a compromise amount to be paid at some stipulated time in the

7

future ..." Id. ¶ 4, Exhibit Y. On March 31, 2004, James Ramich, a member of Noisette's Board of Directors, called Biagetti in Boston and offered that Noisette would pay $75,000 on April 1, 2005 in settlement of the case. Biagetti rejected the offer and stated that ML Strategies' next contact would be from its outside counsel to Noisette's outside counsel. Biagetti Aff. ¶ 6.

On April 2, 2004, ML Strategies filed its Complaint ("Mass. Complaint") in this Court at 2:32 p.m. Marken Aff. ¶ 53, Exhibit Z. The Mass. Complaint seeks damages for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and violation of M.G.L. c. 93A.

Meanwhile, Noisette was racing to the courthouse in an attempt to obtain venue in South Carolina. It filed a Complaint in State Court in Charleston ("SC Complaint") on April 2, 2004, at 2:59 p.m., approximately one-half hour after ML Strategies filed in Massachusetts. Id. ¶ 54, Exhibit AA. The SC Complaint was served by the South Carolina Secretary of State and received by ML Strategies on April 12, 2004. Id. ¶ 55, Exhibit BB. On April 22, 2004, Noisette moved to dismiss the Mass. Complaint without mentioning to this Court its bad faith attempt to seize venue in South Carolina. Id. ¶ 61.

## ARGUMENT

### I. THIS COURT HAS PERSONAL JURISDICTION OVER NOISETTE UNDER THE MASSACHUSETTS LONG-ARM STATUTE BECAUSE NOISETTE "TRANSACTED BUSINESS" WITHIN MASSACHUSETTS

A Massachusetts court may assert personal jurisdiction over a defendant under the Massachusetts long-arm statute "as to a cause of action...arising from the person's transacting any business in this Commonwealth." M.G.L. c. 223A, § 3(a). The plaintiff must show (1) that the defendant "transacted business" in Massachusetts; and (2) that the plaintiff's claim arose from the defendant's transaction of such business. Workgroup Technology Corp. v. MGM Grand Hotel, 246 F.Supp.2d 102, 109 (D. Mass. 2003), citing Tatro v. Manor Care, 416 Mass. 763, 767

8

(1994). The court must accept the plaintiff's evidentiary proffers as true and construe the facts as presented in the "light most congenial to the plaintiff's jurisdictional claim." Id. at 108.

Both Massachusetts and Federal courts have broadly construed the "transacted business" clause as applying to "any purposeful act by an individual, whether personal, private, or commercial." Ealing Corp. v. Harrods Ltd., 790 F.2d 978, 982 (1st Cir. 1986). The reach of the clause extends to the limits allowed by United States Constitution. Tatro, 416 Mass. at 771. The purposeful solicitation of business from a Massachusetts resident will usually suffice to meet the statute. Id. at 767. Consequently, the terms of § 3(a) are easily satisfied, and courts have often conferred jurisdiction where very few contacts existed. See, e.g., Landmark Bank v. Machera, 736 F.Supp. 375, 383 (D. Mass. 1990) (one phone call, one memo, and one letter); Workgroup, 246 F.Supp.2d at 110 (four telephone calls, five emails and three faxes); Bond Leather Co., Inc. v. Q.T. Shoe Mfg. Co., Inc., 764 F.2d 928, 932 (1st Cir. 1985) (four letters and one telephone call).[2] A single act may suffice to satisfy the "transacting business" prong of the long arm statute. Ealing, 790 F.2d at 983. The lack of physical presence is not at all dispositive, as due to modern technology, the "[w]idespread use of the telephone and the mails make actual physical presence unnecessary in many cases." Good Hope Industries v. Ryder Scott Co., 378 Mass. 1, 11 (1979). Emails alone have been deemed sufficient to confer jurisdiction in Massachusetts. First Act v. Brook Mays Music Co., 2004 WL 720382, at *2 (D. Mass. April 2, 2004).

In the instant case, the litany of contacts is overwhelming relative to the number often found by courts as satisfying the Massachusetts long-arm statute. ML Strategies' principal place

---

[2] See also Energy Capital & Svcs. LP, II, v. Hill Refrigeration, 989 F.Supp. 353, 355 (D. Mass. 1997) (despite the fact that the contract in dispute was negotiated, executed, and scheduled to be performed in New Jersey, defendant's purposeful communications into Massachusetts and the existence of a bank account amounted to "transacting business"); Boudreau v. Scitex Corp. Ltd., 1992 WL 159667, at *2 (D. Mass. June 25, 1992) (defendant "transacted business" by negotiating the plaintiff's employment contract through email, fax and telephone); Hahn v. Vermont Law School, 698 F.2d 48, 51 (1st Cir. 1983) (sufficient that defendant sent plaintiff application information and an acceptance letter).

9

of business is in Massachusetts and the person who performed most of the work on the

Engagement for ML Strategies, Anthony Marken, resides and works in Massachusetts. Marken

Aff. ¶ 2. Noisette solicited ML Strategies in Massachusetts for assistance in facilitating the land

transfer from the RDA, in light of Marken's expertise, experience, and relationships with the

Navy and the RDA. Id. ¶¶ 3-11. The Engagement Letter was drafted and executed by ML

Strategies in Massachusetts, and returned by Noisette to Massachusetts along with an initial

payment that was wired to a Massachusetts bank. Id. ¶¶ 12-17. Most of the consulting work on

the Engagement was performed in ML Strategies' Boston office, where Marken participated in

numerous phone calls and generated correspondence and emails to Noisette and third parties

regarding substantive issues on the Project. Id. ¶¶ 18-25. Marken even met with John Knott in

Massachusetts on one occasion regarding the Project. Id. ¶ 26. Noisette knew from the outset

that ML Strategies' work on the Project would be performed in Massachusetts. Id. ¶¶ 15, 56.

During the Engagement, Noisette contacted ML Strategies in Massachusetts many times by

letter, fax, email, and telephone, made regular payments of money to ML Strategies in

Massachusetts, and as stated traveled to Massachusetts to meet with ML Strategies. Id. ¶¶ 27-28.

Noisette also regularly contacted ML Strategies in Massachusetts through its lawyers and

consultants. Id. ¶ 29. These contacts concerned substantive matters relating to the Project and

continued for more than a year. Id. ¶¶ 28-29. Noisette continued to have contact with ML

Strategies in Massachusetts by email, letters, and telephone up to the time this lawsuit was filed.

Id. ¶¶ 34, 36-38, 40-41, 43-45, 47, 50-52; Shapiro Aff. ¶¶ 11-12; Biagetti Aff. ¶¶ 2-6.

    These contacts are surely more than enough to conclude that Noisette transacted business

in Massachusetts directly as well as through its agents. See Brown Rudnick v. Brooks, 2004 WL

626546, at *1 (D. Mass. March 24, 2004) (in action by Massachusetts law firm to collect fees

owed by nonresident client, where client returned an engagement letter that was drafted in

Massachusetts, made telephone calls, sent faxes and emails, and attended meetings in Massachusetts, client was deemed to have had a "litany of contacts" conferring personal jurisdiction); Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 61-62 (1st Cir. 2002) (in action by Massachusetts law professor against Mississippi law firm for share of fees recovered in tobacco litigation, contacts with Massachusetts by the law firm directly and through a South Carolina law firm acting as its agent conferred jurisdiction).

In an analogous case where the defendant sought out the plaintiff for its reputation and ability, was aware that a certain amount of the work would be conducted in the plaintiff's central office in Boston, the retainer agreement was drafted in Boston, and there were multiple emails, faxes, and telephone calls between the parties, the contacts amounted to "transacting business" in Massachusetts. Kirkpatrick & Lockhart, LLP v. The Driggs Corp., 1999 Mass. Super. LEXIS 18, at *5 (Mass. Super. January 22, 1999) (attached hereto as Exhibit 1). Given that one contact may suffice to satisfy the "transacting business" prong, Noisette's numerous contacts certainly meet the requirements of the long arm statute. See Ealing, 790 F.2d at 983.

Noisette makes three fruitless arguments to escape jurisdiction. First, it erroneously contends that its contacts with Massachusetts were incidental and fortuitous, and that its reasons for hiring ML Strategies had nothing to do with ML Strategies' location in Massachusetts. Noisette overlooks that ML Strategies was located in Massachusetts, Noisette solicited ML Strategies in Massachusetts, and Noisette knew that much of the work would be performed by ML Strategies in Massachusetts and in particular by Anthony Marken, who lived in Massachusetts and whose office was in Massachusetts. These contacts were instrumental to the formation of the contract and were thoroughly deliberate. Indeed, these facts are much stronger than in other cases where the Court has found the defendant's contacts with Massachusetts to be purposeful. See Workgroup, 246 F.Supp.2d at 111 (telephone call, faxes, and emails to plaintiff

11

in Massachusetts were instrumental to formation of contract even though the defendant was first

approached by the plaintiff, the communications sent to Massachusetts were at the plaintiff's

request, and the contract was to be performed entirely outside Massachusetts).

The case principally relied upon by Noisette for this proposition, Aub v. Technicolor

Entm't Svcs., 224 F.Supp.2d 371 (D. Mass. 2002), is wholly inapposite. There, the business

relationship grew out of a contract originally made in California when Aub was a resident of that

state, none of Technicolor's executives ever traveled to Massachusetts, and the only reason

Technicolor ever had any contacts with Massachusetts was because Aub chose to move her

consulting business from California to Massachusetts. Id. at 374. By contrast, here Noisette

purposefully contacted ML Strategies in Massachusetts, where it has always been located, in

order to retain the services of the company and Marken who both were based in Massachusetts.

Moreover, unlike in Aub, here Noisette not only communicated with ML Strategies during

formation of the contract by letter, fax, and telephone, but also traveled to Massachusetts and met

with ML Strategies as part of its work on the Project.

Second, Noisette wrongly contends that it did not transact business in Massachusetts

because "all substantive business transactions [on the Project] took place in South Carolina."

Def. Mem. at 9. As stated by this Court in Workgroup, jurisdiction may exist in Massachusetts

even if the entire performance of a contract takes place somewhere else. Workgroup, 246

F.Supp.2d at 111. In any event, most of ML Strategies' and Marken's work took place in

Massachusetts, and Noisette knew that would be the case. Marken Aff. ¶¶ 15, 18-26. The fact

that some of Marken's work was performed in meetings in Washington, D.C., South Carolina,

and Georgia (one meeting) does not mean that ML Strategies' only recourse is to sue Noisette in

South Carolina. See Kirkpatrick & Lockhart, 1999 Mass.Super. LEXIS 18, at *5 (jurisdiction in

Massachusetts existed even though much of Massachusetts law firm's work involved trial of case

in Virginia).[3]

Finally, Noisette's attempt to analogize ML Strategies to a passive purchaser of goods must fail. Noisette did not merely purchase a product manufactured in Massachusetts without any other contact with the state. Noisette was actively involved in negotiating the scope of the Engagement by telephone calls with ML Strategies in Massachusetts, and controlled ML Strategies' performance of services[4] through letters, email, faxes, telephone calls, and a meeting in Massachusetts. The cases are clear that jurisdiction in Massachusetts exists in these circumstances. See, e.g., Little, Brown & Co. v. Bourne, 493 F.Supp. 544, 547 (D. Mass. 1980) (distinguishing passive purchaser cases, as the defendant entered into a contract whereby he would be actively supervising plaintiff's performance); Whittaker Corp. v. United Aircraft Corp., 482 F.2d 1079, 1084 (1st Cir. 1973) (where defendant initially solicited the plaintiff, communicated regularly with the plaintiff, and supervised or participated in plaintiff's performance under the contract, defendant's "participation in the economic life of Massachusetts seem[ed] clearly to rise above that of a purchaser who simply places an order and sits by until the goods are delivered."); Good Hope, 378 Mass. at 9 (defendant's actions not passive but more akin to one who engages "in an enterprise of substantial dimension and duration with a party

---

[3] The cases cited by Noisette on the place of performance issue are easily distinguished. In Information Mapping, Inc. v. Access Health Sys., 2000 WL 1273405, at *2 (Mass. Super. May 10, 2000), it was the intention of both parties that all work be performed at defendant's offices in Tennessee and all substantive work was, in fact, performed there. Id. at *2. Here, there was no intention that all of ML Strategies' substantive work would be performed at Noisette's offices or elsewhere in South Carolina, and as shown it was, in fact, largely performed in Massachusetts where ML Strategies and Marken were located. In Lyle Richard Int'l v. Ashworth, Inc., 132 F.3d 111, 113-114 (1st Cir. 1997), the plaintiff solicited a contractual relationship with the nonresident defendant, the plaintiff's core contractual responsibilities were to be performed outside of Massachusetts, and the plaintiff's activities in Massachusetts were extra-contractual and unilaterally undertaken by the plaintiff. Here, Noisette solicited ML Strategies in Massachusetts, the Engagement Letter contemplated that ML Strategies would perform much of its work at its principal place of business in Massachusetts, and all of the work performed by ML Strategies in Massachusetts was pursuant to the Engagement Letter and in close consultation with Noisette.

[4] The Scope of Services section of the Engagement Letter makes clear that Noisette was to be intimately involved in ML Strategies' work. Exhibit C at 1-2.

whose business headquarters ... were known to be in Massachusetts.").[5]

For these reasons, personal jurisdiction over Noisette exists under M.G.L. c. 223A, § 3(a).[6]

## II.    ASSERTING PERSONAL JURISDICTION OVER NOISETTE IS CONSISTENT WITH DUE PROCESS CONSIDERATIONS

The First Circuit has utilized a three-part test to determine whether asserting personal

jurisdiction over a nonresident defendant is consistent with due process under the United States

Constitution. Daynard, 290 F.3d at 60. All three parts are met in this case.

### A.    ML Strategies' Claims Directly Relate To And Arise From Noisette's Contacts With Massachusetts

The "relatedness" test is a "flexible, relaxed standard" that requires the court to look for

indications that the defendant reached into the forum and that those contacts are the basis for the

claims presently before the court. Workgroup, 246 F.Supp.2d at 113. A lack of physical

presence is by no means fatal to a case for jurisdiction. Id. Rather, where there is no evidence

that the defendant was physically present in the forum state, the court must simply look to other

contacts, such as mail, telephone calls, or faxes, which have been deemed "unquestionably"

jurisdictional contacts related to the contract negotiations between the parties. Id.; Sawtelle v.

Farrell, 70 F.3d 1381, 1389-1390 (1st Cir. 1995). In a contract action, those indications include a

consideration of "prior negotiations and contemplated future consequences, along with the terms

of the contract and the parties' actual course of dealing," instead of relying upon "conceptualistic

---

[5] Noisette makes no argument that the second element for personal jurisdiction under M.G.L. c. 223A, § 3(a) -- that the plaintiff's claim arise from the defendant's transaction of business in the Commonwealth -- is not satisfied in this case. The evidence is plain that this element is satisfied because ML Strategies' causes of action would not exist but for Noisette's contacts with Massachusetts. See Workgroup, 246 F.Supp.2d at 111.

[6] Jurisdiction also exists under M.G.L. c. 223A, § 3(c) for Noisette's acts that caused tortious injury to ML Strategies by an act or omission within Massachusetts. ML Strategies has asserted claims under M.G.L. c. 93A, § 11 for Noisette's unfair and deceptive conduct in (i) misrepresenting that it would pay the Performance Bonus, which induced ML Strategies to continue performing consulting services beyond the term of the Engagement; (ii) inventing pretextual excuses for nonpayment of the Performance Bonus, which caused ML Strategies to expend time and money pursuing payment; and (iii) refusing to pay the Performance Bonus, while admitting the Bonus was owed, unless ML Strategies agreed to a new contract at substantially reduced rates. These claims meet the requirements of § 3(c). See JMTR Enterprises, LLC v. Duchin, 42 F.Supp.2d 87, 97-98 (D. Mass. 1999).

...theories of the place of contracting or of performance." <u>Burger King Corp. v. Rudzewicz</u>, 471

U.S. 462, 478-479 (1985) (citations omitted). A defendant's contacts with the forum are related

for purposes of a contract claim when the contacts are "instrumental either in the formation of

the contract or in its breach." <u>Raymarine, Inc. v. Argonaut Computer, Inc.</u>, 2002 WL 1770803,

at *4-5 (D.N.H. August 1, 2002), *quoting* <u>Phillips Exeter Acad. v. Howard Phillips Fund</u>, 196

F.3d 284, 288 (1st Cir. 1999).

 Here, Noisette directly or through its agents contacted ML Strategies in Massachusetts by

telephone at least six (6) times for purposes of negotiating the Engagement Letter, returned the

signed Engagement Letter to ML Strategies in Massachusetts by mail, and wired the initial

payment to ML Strategies (which payment was required by the Engagement Letter to be returned

with the signed Letter). Marken Aff. ¶¶ 7-11, 14, 17, Exhibit C at 3. These contacts alone are

sufficient to be considered instrumental in formation of the contract. <u>See</u> <u>Workgroup</u>, 246

F.Supp.2d at 113. Thereafter during the Engagement, Noisette directly or through its agents

contacted ML Strategies in Massachusetts by telephone approximately three times a week for at

least a year, by mail at least three (3) times, by fax at least thirteen (13) times, by email at least

seventy-nine (79) times, by meeting one (1) time, and by making eleven (11) payments over the

course of more than a year. Exhibits J-N. All of these contacts related to ML Strategies' work

on the Engagement and/or Noisette's breach of the contract. ML Strategies' claims plainly arise

out of and are related to these contacts, and therefore meet the first part of the three-prong test.

<u>See</u> <u>Brown Rudnick</u>, 2004 WL 626546, at * 1; <u>First Act</u>, 2004 WL 720382, at *2.

  **B.** **Noisette Purposefully Directed Its Activities Toward Massachusetts Such That It Was Foreseeable That Noisette's Failure To Pay The Performance Bonus Would Cause It To Be Sued In Massachusetts**

 In assessing whether this prong is satisfied, courts have focused on whether the

defendant's contacts with the forum state were voluntary and such that the defendant could

15

reasonably anticipate being haled into court in the forum state. Workgroup, 246 F.Supp.2d at 114, *citing* Ticketmaster-NY v. Alioto, 26 F.3d 201, 207-208 (1st Cir. 1994). When a defendant reaches into another forum and creates a continuing relationship and obligations with a citizen of that forum, the defendant "manifestly has availed himself of the privilege of conducting business there" such that it is "presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." Burger King, 471 U.S. at 476.

Plaintiffs have consistently satisfied this prong by demonstrating that a defendant who enters into a contract with a Massachusetts entity could reasonably expect that some services would be performed in Massachusetts or that failure to perform its portion of the contract could result in being haled into a Massachusetts court. See Good Hope, 378 Mass. at 11 (foreseeable that managerial decisions based on the information that the defendant provided in appraisal reports and phone calls would be made in Massachusetts); U.S. Plastics v. Video Update, Inc., 2000 WL 1099540, at *3 (Mass. Super. July 26, 2000) (knowingly and purposefully engaging in transactions with a plaintiff for a period of over fifteen months made foreseeable that if defendant failed to pay for services rendered, it could be haled into the forum's courts); Daynard, 290 F.3d at 62 (jurisdiction appropriate where defendant contemplated that plaintiff would render some services in Massachusetts). "Even in cases where the defendant was not physically present in the forum, where the defendant initiated the transaction by mailing or calling the plaintiff in the forum and when the defendant contemplated that the plaintiff would render services in the forum, all as alleged by [plaintiff] here, many courts have found jurisdiction." Id.

Noisette's contention that it was unforeseeable that it would be haled into a Massachusetts court for breach of the Engagement Letter does not square with the facts. Noisette solicited ML Strategies in Massachusetts because it desired to take advantage of ML Strategies' expertise, experience and contacts regarding redevelopment of military bases. Noisette knew that ML

Strategies was based in Massachusetts and that the persons who were going to perform services on the Engagement resided and worked in Massachusetts. Noisette knew that these persons were not going to relocate to South Carolina for the duration of the year-long engagement. A substantial portion of the services were rendered in Massachusetts, through phone calls, letters, email, faxes and meetings originating from or occurring in Massachusetts. ML Strategies regularly invoiced Noisette in Massachusetts and Noisette regularly sent payments to Massachusetts. Noisette repeatedly represented to ML Strategies in Massachusetts that it would pay the Performance Bonus, which ML Strategies relied upon by continuing to perform work in Massachusetts beyond the initial term of the Engagement. In these circumstances, Noisette certainly should have expected that ML Strategies would sue in Massachusetts for any breach of the Engagement Letter. See Kirkpatrick & Lockhart, 1999 Mass. Super. LEXIS 18, at *2-5.[7]

### C.    Asserting Personal Jurisdiction Over Noisette Is Reasonable In Light Of The Gestalt Factors

For a court to decline jurisdiction, it is incumbent upon the defendant who purposefully directed activities to Massachusetts to present a "compelling case" of other so-called "Gestalt" factors that would render the court's decision to exercise jurisdiction unreasonable. Burger King, 471 U.S. at 477; Champion Exposition Svcs. v. Hi-Tech Electric, LLC, 273 F.Supp.2d 172, 178 (D. Mass. 2003). Noisette has failed to demonstrate that any one of these five factors, much less the totality of the factors, weighs in favor of declining to exercise jurisdiction in this case.

First, Noisette's burden of defending this case in Massachusetts is certainly no greater than ML Strategies' burden would be if it were required to litigate the case in South Carolina. Marken Aff. ¶ 58. Indeed, it may be more convenient for John Knott to travel to Massachusetts, as he apparently vacations on Nantucket and previously met with Marken in Massachusetts in

---

[7] Noisette could have avoided Massachusetts courts by insisting on a forum selection clause as it had with other consultants, but it did not raise this issue during the negotiation of the Engagement Letter. Marken Aff. ¶ 57, Exhibit CC. See U.S. Plastics, 2000 WL 1099540, at *3.

conjunction with a vacation. Id. ¶¶ 26, 58. Noisette has failed to adduce any facts that being

subject to jurisdiction "is onerous in a special, unusual, or other constitutionally significant way."

Champion Exposition Svcs., 273 F.Supp.2d at 178; Nowak v. Tak How Investments, Ltd., 94

F.3d 708, 718 (1st Cir. 1996).

Second, Massachusetts has "a significant interest in ensuring that contracts entered into

by Massachusetts residents are given full effect." Champion, 273 F.Supp.2d at 179. It also has a

strong interest in providing its residents a forum in which to assert their claims, particularly

where as here the defendant solicited their business in Massachusetts. Nowak, 94 F.3d at 718.

Third, ML Strategies has an interest in litigating this matter in Massachusetts, which is its

principal place of business and where its witnesses are located. Champion, 273 F.Supp.2d at

179. "This Court must accord deference to the [plaintiff's] choice of a Massachusetts forum."

Nowak, 94 F.3d at 718.

Fourth, litigating the case in South Carolina may not afford effective relief to ML

Strategies and may undermine efficient administration of justice, as a court in that jurisdiction is

likely unfamiliar with the claims asserted by ML Strategies under M.G.L. c. 93A. Champion,

273 F.Supp.2d at 179; Nowak, 94 F.3d at 718.

Fifth, Massachusetts has a substantial policy interest in protecting its service providers

from having to file collection actions in jurisdictions other than Massachusetts for engagements

that arose and were performed in Massachusetts. Champion, 273 F.Supp.2d at 179; Nowak, 94

F.3d at 718.

On balance, the Gestalt factors weigh heavily in favor of exercising jurisdiction in

Massachusetts. Id. As all three parts of the test under the due process clause have been met,

there is no constitutional bar to assertion of personal jurisdiction over Noisette.

**III.  Noisette Has Failed To Show That A Dismissal Upon Grounds Of *Forum Non Conveniens* Is Appropriate**

As acknowledged by Noisette, motions to dismiss on grounds of *forum non conveniens* are underline disfavored. The First Circuit has emphasized that "the doctrine of *forum non conveniens* is used to avoid 'serious unfairness' and that plaintiff's choice of a forum will be disturbed only rarely." Nowak, 94 F.3d at 720, *quoting* Howe v. Goldcorp Inv., Ltd., 946 F.2d 944, 950 (1st Cir. 1991). The burden falls on the defendant to demonstrate that an adequate alternative forum is available to both parties, and that a trial in the chosen forum will be "oppressive and vexatious to either the defendant or the judicial system." Boudreau, 1992 WL 159667, at * 4.  The plaintiff should be deprived of its choice of forum only upon a "clear showing of facts which . . . establish such oppressiveness and vexation to a defendant as to be out of all proportion to plaintiff's convenience." Nowak, 94 F.3d at 720, *quoting* Koster v. Lumbermens Mut. Co., 330 U.S. 518, 524 (1947).

Noisette has failed to offer any affidavits supporting its claims that litigating this case in Massachusetts would be unduly oppressive or vexatious.  With no evidentiary support, Noisette blithely asserts in its brief that representatives from Noisette, the City of Charleston and the RDA likely will have discoverable knowledge and relevant documents, and an action brought in South Carolina would be more convenient to those unnamed witnesses. Def. Mem. at 18.  Noisette also expresses concern that former Noisette employees may not be amenable to traveling to Massachusetts. Id. at 19.  However, these general statements, which not only are unsworn but also fail to provide any names of potential witnesses or description of their likely testimony, fall far short of demonstrating such a compelling need as to have the matter dismissed. Champion, 273 F.Supp.2d at 180 (rejecting *forum non conveniens* argument where defendant's assertion "that California would be a more convenient forum, disputed as it is by [plaintiff], does not

19

constitute evidence that judicial efficiency strongly favors litigating in California").[8]

In fact, this case should not require testimony from any live witnesses and should be resolved in ML Strategies' favor on summary judgment. If the Court concludes that the Engagement Letter is ambiguous and there exist material issues of disputed fact requiring a trial, the key issue at trial will be the parties' intent and the key witnesses on that issue will be the persons who signed the Engagement Letter, i.e. Marken and Shapiro of ML Strategies and Noyes and Knott of Noisette. Marken and Shapiro live and work in Massachusetts, and it would be at least as inconvenient for them to travel to South Carolina for a trial as it would for Noyes and Knott to travel to Massachusetts. Marken Aff. ¶ 58; Shapiro Aff. ¶ 15. The principal documents involved in the case are the Engagement Letter itself and Noisette's emails confirming that it would pay the Performance Bonus. See Exhibits C, Q, S-U. These documents already are in the possession of both parties. Even if this case were to require use of documents concerning the underlying real estate transactions or regulatory issues on which ML Strategies provided assistance, most of those documents were provided to ML Strategies during the Engagement and are located in Massachusetts. Marken Aff. ¶ 60.[9]

ML Strategies' choice to sue in Massachusetts should therefore stand. Boudreau, 1992 WL 159667, at *5; Fairview Machine & Tool, Inc. v. Oakbrook Int'l, Inc., 56 F.Supp.2d 134, 141-142 (D. Mass. 1999).

---

[8] Courts have declined to dismiss or even transfer a case when a defendant fails to submit "precise information, in affidavit form, about the witnesses he intends to call and the anticipated areas of testimony, so that the court can intelligently weigh the factor of witness convenience." Abeloff v. Barth, 119 F.R.D. 315, 330 (D. Mass. 1988). See also Home Owners Funding Corp. of America v. Century Bank, 695 F.Supp. 1343, 1348 (D. Mass. 1988) (defendant failed to carry burden on proposed transfer by neglecting to identify the key witnesses with respect to the breach of contract claim and the importance of their respective testimonies).

[9] The fact that the Project property is located in South Carolina does not help Noisette. Where the claim at issue is breach of contract and is therefore "transitory" or "in personam" in nature, the location of the real property is irrelevant to a motion to dismiss on grounds of *forum non conveniens*. See Nation One Mortgage Co. v. Barnett, 2000 WL 1766809, at *4 (Mass. Super. March 28, 2000) (motion denied despite defendants' arguments that Missouri was the proper forum since it was the location of the subject properties relative to the alleged fraudulent loan applications, the relevant documents were executed there, and the necessary witnesses were located there).

20

## CONCLUSION

For these reasons, ML Strategies respectfully requests that this Court DENY Noisette's

Motion to Dismiss.

David E. Lurie, BBO# 542030
Sara A. Laroche, BBO# 652479
LURIE & KRUPP, LLP
One McKinley Square
Boston, MA 02109
(617) 367-1970

Dated: May 6, 2004

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served by hand on defendant's counsel Sean F. McDonough, Esq., Morrison, Mahoney & Miller, LLP, 250 Summer Street, Boston, MA 02210-1181 on May 6, 2004.

David E. Lurie