# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ML Strategies, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Civil Action No. 04-10641-RCL** |
| | ) | |
| The Noisette Company, LLC | ) | |
| d/b/a Noisette Company, | ) | |
| | ) | |
| Defendant. | ) | |

## AFFIDAVIT OF ANTHONY G. MARKEN

I, Anthony G. Marken, on oath depose and say as follows:

1.      I am Vice President of the Military Installations Division of plaintiff ML Strategies, LLC ("ML Strategies"). I have held this position since the summer of 2001. I submit this Affidavit in support of ML Strategies' Opposition to Defendant The Noisette Company, LLC's ("Noisette") Motion to Dismiss in this case. I am fully familiar with and competent to testify to the facts set forth below.

### Noisette's Solicitation of ML Strategies in Massachusetts

2.      ML Strategies is a strategic consulting company specializing in, among other things, government relations, real estate, and project development. ML Strategies has a principal place of business at One Financial Center, Boston, Massachusetts. I have worked in ML Strategies' Boston office throughout my tenure at ML Strategies. I am a resident of Dover, Massachusetts.

3.      ML Strategies' Military Installations Division is under my direction.  The Military Installations Division was formed to provide strategic advice to local redevelopment authorities, communities, and developers involved with military base closure and conversion issues resulting from the federal Base Realignment and Closure Act ("BRAC").  Attached as Exhibit A is a summary from ML Strategies' web site of the services provided by, and the expertise and experience of, the Military Installations Division.

4.      My practice at ML Strategies focuses on strategic planning on the local, state and federal level with entities responsible for redevelopment of military installations associated with the BRAC legislation. These initiatives include ongoing strategic planning for complex real estate issues at former federal facilities. As part of my practice, I assist private sector development teams in planning and acquisition processes for these sites.  Attached as Exhibit B is biographical information about me from ML Strategies' web site.

5.      Noisette is an entity created to redevelop the Charleston Naval Shipyard in North Charleston, South Carolina (the "Project").  In January 2002, Noisette approached ML Strategies in connection with Noisette's pursuit of redevelopment rights for the Project.

6.      Prior to being approached by Noisette, I was generally aware of the Project through Sasaki Associates, a planning firm based in Watertown, Massachusetts that had worked on the Charleston Naval Shipyard Project at its outset and with whom I had worked on the redevelopment of the South Weymouth, Massachusetts Naval Base.  I was also aware of the Project due to my involvement in the National Association of Installation Developers ("NAID"), a trade association of professionals involved in the redevelopment of military bases.  ML Strategies is a member of NAID and a sponsor of various NAID events.

7.      In January 2002, I received a telephone call in my Boston office from Douglas Weil, who works for ML Capital, LLC, a firm affiliated with ML Strategies that makes equity investments in companies and that is located in the same building as ML Strategies in Boston. Weil said he had received a telephone call from Paul Tantillo, an investment professional who had a client that was interested in speaking with ML Strategies about issues regarding redevelopment of a military base. Weil and I then met in his Boston office and spoke by telephone with Tantillo, who said his client Noisette was having major issues with the state redevelopment agency ("RDA") on the Project and that Noisette was in need of assistance to facilitate and expedite the Project. Tantillo provided me with contact information for Roger Noyes, the then-Chief Financial Officer for Noisette.

8.      I then spoke with Noyes by telephone from my office in Boston. We discussed Noisette's problems with the RDA, including the RDA's lack of cooperation with Noisette and the strained relationship between the two entities. I explained my experience and expertise, and gave Noyes the names of some references for me, including an Undersecretary of the Navy. I told Noyes that I knew Jack Sprott, the Executive Director of the RDA who was an NAID board member, as well as Navy officials in the region in which the Project was located, and that these contacts would be useful in facilitating productive communications between the parties.

9.      Noyes then called me in my Boston office and said that Noisette would like to bring ML Strategies on board and negotiate a scope of work.

**The Engagement Letter**

10.     I then discussed our engagement by Noisette (the "Engagement") with David Shapiro, ML Strategies' Vice President, who also works in our Boston office. Shapiro and I drafted a proposed scope of work that I then faxed to Noyes at his request.

11.     I then spoke by telephone from my Boston office with John Knott, Chief

Executive Officer of Noisette. We discussed the scope of the Engagement and the background

of the Project, including the facts that Noisette had been selected as developer of the Project by

the City of North Charleston (the "City") not by the RDA, the RDA was being contentious, the

RDA had not yet transferred any property to the City for subsequent transfer to Noisette, and

Knott believed that the RDA wanted to select its own developer for the Project.

12.     With regard to fees for the Engagement, I told Noyes during our telephone

conversations in late January or early February 2002 that ML Strategies would require a fee of

about $20,000 per month plus expenses, which is a normal fee for an ML Strategies engagement

of this scope. Noyes responded by stating that Noisette did not have the cash to fund such a

monthly fee, and proposed instead a reduced monthly fee plus a success fee. ML Strategies

agreed to this concept and proposed a performance bonus ("Performance Bonus") of $250,000 in

exchange for reduction of its usual monthly consulting fee to $10,000 per month. Noisette

represented that it would not have cash to fund the Performance Bonus until it received the

property involved in the Project, as it had no other source of funds other than its investors. In

reliance on these representations, ML Strategies further agreed that the timing of the payment of

the Performance Bonus would be negotiated with Noisette at a future time.

13.     David Shapiro and I then drafted an engagement letter in our Boston office

("Engagement Letter", attached as Exhibit C) dated February 14, 2002 reflecting the agreed-

upon scope of and compensation for the Engagement. We both signed the Engagement Letter in

Boston and sent it to Noisette on or about February 14, 2002. The Engagement Letter

contemplated that the term of the Engagement would be one year, would be renewable by mutal

agreement of the parties, and would commence on March 1, 2002.

4

14.    On information and belief, in March 2002 Noisette's board met and approved the Engagement Letter, changing only the commencement date of the Engagement to April 1, 2002. Noyes and Knott executed the Engagement Letter on behalf of Noisette, initialed the changed commencement date, and returned the fully-executed letter to me in Boston. The Engagement Letter attached the professional biographies of the ML Strategies staff members who would be working with Noisette on the Engagement. These staff members were me, David Shapiro, Stephen Tocco, and Robert Ryan. All of these staff members lived in Massachusetts and worked in ML Strategies' Boston office.

15.    In its Scope of Services section, the Engagement Letter states in part that "[d]uring the first sixty (60) days of this engagement, [ML Strategies] will assist Noisette in (i) creating an action plan for the execution of a land disposition agreement by December 31, 2002, and (ii) identify any expected or potential development issues." Noisette knew when it signed the Engagement Letter that these and other services described therein would be performed largely in ML Strategies' Boston office by Boston-based staff members including me.

16.    In its Compensation section, the Engagement Letter provides for a performance bonus ("Performance Bonus") as follows:

> **[U]pon the successful execution of a land disposition plan negotiated between Noisette and the City of North Charleston pursuant to this engagement letter, on or before January 1, 2003, MLS shall be paid a performance bonus in an amount equal to two hundred-fifty thousand dollars ($250,000). . . .** Said performance bonuses shall be payable on a schedule that MLS and Noisette will subsequently determine.

(emphasis added).

17.    The Engagement Letter also provides in its Compensation section that "the [$10,000] fee for the first month of the engagement shall be paid contemporaneously with Noisette's acceptance of this letter agreement (invoice enclosed)." On March 25, 2002, I spoke

from my Boston office with Arthur Titus, Noisette's President.  Titus requested that I fax him

wiring information for the initial payment, which I did.  Noyes subsequently informed me that

Noisette wired $5,000 on March 26, 2002.  The funds were wired to an account at Fleet Bank of

Massachusetts, N.A. in the name of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., the

law firm with which ML Strategies is affiliated.  Copies of documents reflecting the wire transfer

instructions, the telephone conversations with Titus and Noyes regarding the wire transfer, and

the receipt of the wire transfer are attached as Exhibit D.

<b><u>ML Strategies' Work on the Project in Massachusetts</u></b>

18.    As contemplated under the Engagement Letter, during the first sixty (60) days

following April 1, 2002 I worked closely with Noisette to create an action plan for the execution

of a land disposition agreement by December 31, 2002.  Thereafter I became an integral part of

the Noisette development team and consulted with Noisette often on a daily basis regarding

anticipated and new issues affecting the Project.

19.    The issues on which I was consulted were substantial and numerous.  They

included among other things:  (a) developing a smooth working relationship with the RDA and

the Department of Defense, agencies with which Noisette had no cooperative relationship; (b)

expediting the survey and valuation of property owned by the Navy; (c) assisting Noisette

regarding environmental insurance issues for the Project; (d) facilitating transfer of regulatory

permits from the RDA to the City of North Charleston; (e) assisting in strategies for retaining

properties that would otherwise revert to the City of Charleston; and (f) working with the

Economic Development Agency ("EDA") to resolve outstanding grant issues impeding land

transfer from the EDA to the City of North Charleston.

6

20.    I performed the consulting services mostly in my office in Boston. While I attended certain meetings in South Carolina, Georgia (one meeting), and Washington, D.C. as part of the Engagement, my base of operations was in Boston. My computer, secretary, case files, and reference materials were and are located in Boston, and I utilized all of them extensively as part of the Engagement. I communicated regularly with Noisette by telephone, email, fax, and letters in my office in Boston regarding substantive issues on the Project. I also communicated with third parties (governmental agencies, legislators, etc.) by telephone, email, fax, and letters in my office in Boston regarding substantive issues on the Project.

21.    As part of the Engagement, I generated various correspondence and memos in my Boston office. Samples of such correspondence and memos are attached hereto as Exhibit E. These correspondence and memos utilized ML Strategies letterhead, which shows that they were generated out of my Boston office. These samples include: a letter from me to counsel for the U.S. Senate Committee on Commerce, Science and Transportation discussing Noisette's proposed redevelopment plan; a letter from me to a senior staff official for Senator Ernest Hollings enclosing a detailed analysis of EDA grants applied to the Charleston Naval Shipyard; and a memo from me to Knott and Titus regarding my continuing communications with Senator Hollings' office regarding EDA recapture issues.

22.    As part of the Engagement, I generated various emails in my Boston office. Samples of such emails are attached hereto as Exhibit F. These samples include: an email from me to Noisette regarding the Defense Department's Base Closure and Federal Property Disposal Manual's provisions regarding environmental indemnification on property transfers; an email from me to Noisette regarding a New York Times interview with Knott regarding the Project; an email from me discussing in detail a meeting with the EDA regarding grant recapture issues; and

7

an email from me to Senator Hollings' senior staff regarding options for grant recapture being discussed with the EDA.

23.    As part of the Engagement, I placed numerous telephone calls out of my Boston office and received numerous telephone calls in my Boston office, including conference calls with multiple participants. I often took notes during these telephone calls in my Boston office. Attached as Exhibit G are sample notes of telephone calls that took place in my Boston office. They reflect calls regarding environmental contamination/indemnification issues, RDA obstacles, and EDA grant issues (including a February 12, 2003 call with John Knott on a meeting he had regarding the EDA issues).

24.    I have read the Affidavit of Roger Noyes submitted by Noisette, in which he states that "[o]ver the next twelve (12) to eighteen months, I was in contact with Marken off and on by telephone." This statement is misleading because my contact with Noyes occurred principally at the beginning of the Engagement, before Arthur Titus replaced him as my main contact at Noisette other than John Knott. Noyes also claims that his phone conversations with me were "normally with Marken on his cell phone, and during those calls [Marken] was more frequently traveling in some location other than Boston than he was in his office in Massachusetts." This statement is incorrect because most of my telephone calls with Noyes took place with me in my Boston office using my office phone, like the calls described in Paragraphs 8 and 9 above.

25.    I have also read the Affidavit of Arthur Titus submitted by Noisette, in which he acknowledges that he talked to me on the phone "with some frequency" on the Project, but claims that "Marken and I called each other most of the time on our cell phones, and much of the time Marken was traveling and was in a location other than Boston." This statement is incorrect

and misleading in two respects. First, as with Noyes, most of my telephone calls with Titus took place with me in my Boston office using my office phone. For example, starting in August 2002 and continuing for about the next six months, I attended weekly task force meetings with Titus on the Project, approximately half of which I participated in by telephone in my Boston office using my office phone. Second, when I did speak with Titus by cell phone, I was outside my office in Boston but more often than not still within Massachusetts. For example, I would speak with him by cell phone when I was traveling between my home in Dover, Massachusetts and my Boston office or when catching a plane at Logan airport in Boston.

26.    As part of the Engagement, I also met with Noisette in Massachusetts. In late summer or early fall 2002, John Knott told me that he would be visiting his daughter in Massachusetts on Nantucket and would like to meet me in Boston during his trip and discuss the status of the Project. Knott later called me in Boston from Nantucket to set a time and place to meet. He said he would be staying at the Marriott Copley Place in Boston. I suggested that we meet in the Oak Room at the Copley Plaza Hotel in Boston, which is near the Marriott Copley Place. I met him and his wife at the Oak Room in the late afternoon before they went out to dinner. We discussed the status of the Project and the next steps to be taken. As a result of this meeting in Massachusetts, I did not need to travel to South Carolina that week for a status meeting on the Project. During the meeting with Knott, he said that his daughter was interested in working at a museum with a curator and asked if we would help circulate her resume. (Several months later we received by email in Boston his daughter's resume. See Exhibit H). Noyes and Titus therefore are incorrect when they state in their Affidavits that "no representative of the Noisette Company traveled to Massachusetts to conduct any business with ML Strategies or Marken" and that "Noisette has not conducted business in Massachusetts."

9

27.    Finally, as part of the Engagement, I also sent Noisette monthly bills out of my office in Boston.  See bills and cover letters attached as Exhibit I.

### Noisette's Contacts With Massachusetts

28.    Noisette's direct contacts with ML Strategies in Massachusetts during the Engagement were substantial and numerous, which is not surprising given that ML Strategies performed much of its work on the Project in Massachusetts.  In addition to the contacts described above, Noisette's contacts with Massachusetts included:  (a) letters; (b) emails; (c) faxes; (d) telephone conversations; (e) payments; and (f) a meeting with John Knott.

(a)    Letters.  Noisette sent me letters in Massachusetts enclosing materials and articles about the Project, especially at the beginning of the Engagement.  For example, attached as Exhibit J are a letter dated 4/5/02 enclosing a copy of the Memorandum of Agreement between the City and the RDA, a letter dated 4/12/02 enclosing articles and background information on John Knott, and an undated letter enclosing a copy of information about Noisette that was submitted to Governor Mark Sanford.

(b)    Emails.  Noisette sent me many emails in Massachusetts throughout the Engagement.  Approximately sixty-one (61) such emails are attached as Exhibit K.  These emails concern a wide variety of issues on the Project, including land transfer issues, recapture of EDA money, the purchase agreement between Noisette and the City, transition matters with RDA, environmental opinion, a New York Times interview of John Knott, meetings with EDA, closing of the transaction, rentals from transferred property, responses to information requested by the RDA, deed issues, discussions with Senator Hollings' office regarding recapture, and monies owed by Noisette to ML Strategies.  While I have not yet been able to retrieve and review all of

10

the emails sent by Noisette to me in Massachusetts, I expect that the actual number of such emails is greater than sixty-one (61).

(c)     Faxes.  Noisette sent me many faxes in Massachusetts throughout the Engagement.  Attached as Exhibit L are some of the faxes, each page of which bears the legend "Noisette Company" at the top.  All of these faxes were received by me at my office in Boston.

(d)     Telephone calls.  I estimate that I spoke by telephone from Massachusetts to Noisette an average of three times a week from April 2002 through May 2003 on the Engagement.  Some of these calls were placed by me in Massachusetts, and some were placed by Noisette to Massachusetts.  As stated, most of these calls involved my office phone in Boston rather than my cell phone.

(e)     Payments.  In addition to its initial wire transfer of $5,000, Noisette made eleven (11) additional payments by check to ML Strategies in Massachusetts.  These payments were mailed to ML Strategies in Massachusetts between April 2002 and July 2003 and deposited in a bank account with Fleet Bank of Massachusetts, N.A. Copies of these checks are attached as Exhibit M.

(f)     Meeting with John Knott.  As described above, John Knott traveled to Massachusetts in late summer or early fall 2002, met me at the Oak Room at the Copley Plaza Hotel in Boston, and discussed with me the status of the Project and the next steps to be taken.

29.     Noisette also regularly contacted me in Massachusetts through its lawyers and consultants with whom I worked closely on the Project.  For example, attached as Exhibit N are approximately eighteen (18) sample emails from Andy Gowder, Noisette's attorney in South Carolina, and Keith West, Noisette's public relations consultant, to me in Massachusetts concerning the Project.

11

**Noisette's Breach of Contract and Bad Faith Conduct**
**In Failing To Pay The Performance Bonus Owed To ML Strategies**

30.     ML Strategies' key contributions to the success of the Project were repeatedly

recognized by Noisette.  Attached as Exhibit O are various documents reflecting such

recognition, including:

- a May 13, 2002 Noisette board meeting document stating that Noisette will use
  ML Strategies "to expedite the appraisal process" and is "relying upon ML
  Strategies to use their relationship with the Navy to move the process along."

- a 9/4/02 memo from Knott to the Noisette board stating that "ML Strategies will
  be here this week to meet with RDA and Noisette on expediting their role in the
  transfer."

- a 11/14/02 email from Gowder to me in Boston, asking my thoughts and
  thanking me for my "continuing help"

- a 1/23/03 email from Knott to me stating "[t]hanks for a great job and such short
  notice one day to get to Atlanta."

- a 3/14/03 email from Knott to me in Boston stating that "[w]e are really
  dependent on your access to Jerry [Foster, an EDA attorney]" and "you are the
  experts."

31.     As a result of the substantial assistance rendered by ML Strategies, Noisette was

able to negotiate and execute a Purchase and Sale Agreement with the City of North Charleston

prior to the end of 2002.  A copy of the Purchase and Sale Agreement is attached as Exhibit P.

The Purchase and Sale Agreement states that Noisette has assembled a "a team of nationally and

internationally known and recognized leaders in sustainable design, engineering, construction

12

and other associated professions to assist in [the Project]," and that "these professionals include
. . . ML Strategies." Exhibit P at p. 13.

32.    The Purchase and Sale Agreement qualified as a "land disposition plan" under the
Engagement Letter. Thus, upon negotiation and execution of the Purchase and Sale Agreement,
which occurred before January 1, 2003, the Performance Bonus was earned by ML Strategies.
As provided in the Engagement Letter, the timing of the payment of the Performance Bonus
remained to be determined by Noisette and ML Strategies.

33.    In or about February 2003, the closing of the transaction was postponed due to an
issue regarding recapture of EDA grant monies. As of ML Strategies' bill dated February 20,
2003, Noisette owed ML Strategies $37,271.50 for monthly fees and expenses. See Exhibit I.
Representatives of Noisette indicated to me that it did not have enough cash to continue paying
ML Strategies' $10,000 per month fee on a timely basis, but that it would continue to pay ML
Strategies' expenses and would pay all amounts owed to ML Strategies when the transaction
closed. They also indicated that Noisette desired to have ML Strategies continue to provide
consulting services beyond the initial term of the Engagement, which would expire on April 1,
2003. No representative of Noisette indicated to me that the Performance Bonus had not been
earned; to the contrary, they indicated that the Performance Bonus, along with ML Strategies'
monthly consulting fees, would be paid at or after the closing of the transaction.

34.    In or about March 2003, I left a phone message for John Knott asking about the
payments owed ML Strategies, including the Performance Bonus, in light of ML Strategies'
fiscal year ending on March 31, 2003. On March 14, 2003, John Knott replied to me in
Massachusetts by email, a copy of which is attached as Exhibit Q. He stated in part:

> . . . I apologize for not having the receivable matter resolved in advance of your
> call. As Truman says that buck stops here. . . .

13

... All bills will be fully paid at settlement [closing] or within 2 days after. ...

... We are assuming that this [time until closing] will be a very short period of time . . . .

... **Your performance fee was agreed to be paid by the City but not in writing as we informed you at that time. We expect that this will be paid over time from payments that we make to the City**.

(emphasis added).

35.    In reliance on Knott's assurances that the Performance Bonus would be "paid over time," ML Strategies continued to provide services on the Project past the April 1, 2003 expiration date of the original Engagement, despite the fact that Noisette was not paying ML Strategies its monthly consulting fees in a timely manner.

36.    From February through June 2003, Noisette and its South Carolina counsel continued to make urgent requests for assistance from ML Strategies, and ML Strategies continued to provide advice and assistance on issues crucial to closing of the transaction. Attached as Exhibit R are examples of these requests, including a 2/25/03 email from Gowder to me in Boston requesting assistance with responding to questions posed by the EDA on recapture issues; a 3/5/03 email from Knott to me in Boston stating that "[w]e need to know a lot more about this [recapture] process and the actual practice of how this is done ASAP. Please call." (capitals in original); a 3/18/03 email from Gowder to me in Boston asking me to "subtly touch base with Washington"; and a June 2, 2003 email from Titus to me in Boston asking "[w]hat are your thoughts??" regarding certain issues with the EDA.

37.    By email dated June 23, 2003 (attached as Exhibit S), Knott again confirmed that "[w]e will be paying all bills current immediately following closing including ML Strategies."

14

38.     The transaction closed on or about July 7, 2003. Noisette paid all outstanding ML Strategies invoices for monthly fees and costs, but failed to pay any portion of the Performance Bonus.

39.     On or about July 31, 2003, David Shapiro and I met with Titus and Knott in South Carolina to discuss a payment schedule for the Performance Bonus. We agreed to the following schedule: (a) $125,000 would be paid to ML Strategies on or before September 1, 2003; and (b) the remaining $125,000 would be paid to ML Strategies upon the final transfer of the remaining land from the Navy to the City. Knott stated that Noisette recognized that ML Strategies' contract was with Noisette, not the City, and that **whether or not the City assumed the obligation, Noisette would make good on it**. Knott also indicated that he would like to enter into a new consulting agreement with ML Strategies under the same terms ($10,000 per month plus expenses) for additional work on the Project.

40.     Noisette, however, continued to stonewall payment of the Performance Bonus. By email dated August 26, 2003 to me in Massachusetts (attached as Exhibit T), Knott stated: "Mayor agrees with the amount [of the Performance Bonus]. We still need to work out the process that will facilitate funding to you. This is not something that the Mayor will discuss with you directly, so please let us handle."

41.     By email dated September 15, 2003 to me in Massachusetts (attached as Exhibit U), Knott sent me an email to be forwarded to Steve Tocco, Chairman of ML Strategies, regarding the Performance Bonus. Knott mistakenly stated that ML Strategies had agreed to a reduced fee of $125,000, which was incorrect. Knott further stated that "**the performance payment of $125,000 is in principle understood**, we still do not have a firm date or process with the City to accomplish" (emphasis added).

42.    By email dated October 7, 2003 (attached as Exhibit V), David Shapiro replied to Knott's September 15, 2003 email and reminded Knott that ML Strategies had not agreed to accept a reduced Performance Bonus of $125,000, but rather had agreed to accept $125,000 of the Performance Bonus now and defer payment of the remaining $125,000 until the remaining land was transferred.  Shapiro also asked Knott to clarify when the first $125,000 would be paid.

43.    Noisette then attempted to impose a new condition for payment of the Performance Bonus that was not part of the parties' bargain, i.e., that ML Strategies continue to provide services to Noisette at a substantial discount from the $10,000 monthly rate set forth in the Engagement Letter (which rate was substantially discounted from ML Strategies' usual rate in exchange for the Performance Bonus).  I had several communications concerning the possible scope of the new engagement with Noisette representatives during October and November 2003, including an email from me to Titus on October 10, 2003; an October 15, 2003 conference call with Knott, Titus, Shapiro and me (Shapiro and I were in Boston); a November 21, 2003 telephone call with Titus; and a November 24, 2003 email from Titus.  On December 1, 2003, we forwarded a draft engagement letter for the new contract to Noisette.  Noisette representatives indicated to us that the Noisette Board approved the new draft engagement letter at its December meeting.

44.    On December 30, 2003, Shapiro and I (in Boston) spoke with Titus by telephone. Titus acknowledged that ML Strategies had performed well under the initial Engagement and that Noisette needed ML Strategies in this continued effort.  However, Titus insisted that ML Strategies reduce its monthly fee to $5,000-$6,000.  Shapiro picked up the phone and had a private conversation with Titus.  It is my understanding that Titus then acknowledged that $125,000 of the Performance Bonus was due and payable, but refused to commit to any payment

schedule even for that portion of the bonus. The entire phone call lasted approximately 1 hour and 45 minutes.

45.     It is my understanding that on January 8, 2004, Shapiro had a further telephone call with Knott and Titus during which they once again acknowledged that Noisette owed the Performance Bonus to ML Strategies, but could not commit to a payment schedule. Shapiro told them that the issue of the Performance Bonus needed to be resolved before the new contract could be discussed further. It is also my understanding that later during this call Knott claimed, for the very first time, that ML Strategies had not performed its obligations under the Engagement Letter and that is why on July 31, 2003 Knott allegedly had agreed to pay only $125,000 of the Performance Bonus. Two days later, Titus called me in Boston and stated that (1) Knott was wrong in his position on ML Strategies' performance, and in fact Noisette would not be where they were without us; (2) Noisette intended to honor the Performance Bonus although it could not commit to a schedule for payment; and (3) Noisette's Board of Directors was beginning to review Knott's handling of the matter, and this was part of the problem.

46.     Having received no payment of the Performance Bonus or any written commitment regarding the schedule on which it would be paid, by letter dated January 15, 2004 (attached as Exhibit W) ML Strategies requested payment within ten days.

47.     By letter dated March 19, 2004, Peter Biagetti, Managing Director – Firm Management for Mintz Levin, demanded payment of the Performance Bonus within seven days or the matter would be referred to outside counsel. By letter dated March 24, 2004 Noisette's attorney, W. Andrew Gowder, Jr., responded and asserted for the first time that the Performance Bonus was not earned by ML Strategies because the property to be redeveloped was not actually transferred or conveyed from the City to Noisette prior to December 31, 2002. Copies of these

17

letters are attached as Exhibit X. It is my understanding that on March 24, 2004, Gowder called

Biagetti in Boston and reiterated Noisette's newly-contrived position that the Performance Bonus

was due only if the property was transferred or conveyed by the end of 2002, and Biagetti

responded that it was likely that ML Strategies would prepare and send to Noisette a draft

Complaint with one last chance to pay before suit was filed.

48.     This new position by Noisette is inconsistent with its repeated past

acknowledgments that ML Strategies has earned the Performance Bonus, as well as the plain

language of the Engagement Letter which does not make conveyance or transfer of the property

prior to December 31, 2002 a condition precedent to payment of the Performance Bonus.

**Noisette's Bad Faith Filing Of A
Declaratory Judgment Action In South Carolina**

49.     Having received no satisfaction from Noisette, ML Strategies referred this matter

to outside counsel. By letter dated March 29, 2004 (attached as part of Exhibit Y), David E.

Lurie of Lurie & Krupp, LLP, ML Strategies' outside counsel in Boston, demanded payment of

$125,000 of the Performance Bonus by March 31, 2004, and the remaining $125,000 upon

transfer of the remaining property to Noisette or by June 30, 2004, whichever was earlier. The

letter explained in detail why Noisette's after-the-fact "interpretation" of the Engagement Letter

was not consistent with the language of the document or the parties' intent, and made no sense.

50.     It is my understanding that upon receiving Mr. Lurie's letter, Andrew Gowder

called him and said Noisette could not pay the $125,000 demanded by March 31, 2004, but

would be willing to discuss payment of a significant sum in a 12-18 month time frame. Mr.

Lurie responded by leaving a voicemail for Mr. Gowder that ML Strategies needed $125,000

paid by April 2, 2004, the end of its fiscal year, as a sign of good faith, with a payment plan for

the remaining $125,000, and that otherwise his instructions were to proceed to collect the debt.

51.    By letter dated March 30, 2004 (attached as part of Exhibit Y), Mr. Gowder replied to Mr. Lurie that Noisette was unwilling to make a payment by April 2, 2004, but was "willing to agree to a compromise amount to be paid at some stipulated time in the future ..."

52.    It is my understanding that on March 31, 2004, James Ramich, a member of Noisette's Board of Directors, called Peter Biagetti in Boston and offered that Noisette would pay $75,000 on April 1, <u>2005</u> in settlement of the case. Biagetti rejected the offer and stated that ML Strategies' next contact would be from its outside counsel to Noisette's outside counsel.

53.    On April 2, 2004, ML Strategies filed its Complaint ("Mass. Complaint") in this Court at 2:32 p.m. A copy of the Complaint without exhibits is attached as Exhibit Z. The first page of the Mass. Complaint shows the date and time of filing. The Mass. Complaint seeks damages for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and violation of M.G.L. c. 93A. Andy Gowder accepted service of the Complaint the same day.

54.    Meanwhile, Noisette was racing to the Courthouse in an attempt to obtain venue in South Carolina. It filed a Complaint in State Court in Charleston ("SC Complaint") on April 2, 2004, at 2:59 p.m., approximately one-half hour after ML Strategies filed in Massachusetts. The SC Complaint seeks a declaratory judgment that Noisette does not owe ML Strategies the Performance Bonus because no property was transferred or conveyed by December 31, 2002. A copy of the SC Complaint is attached as Exhibit AA. The first page of the SC Complaint shows the date and time of filing.

55.    The SC Complaint was served on ML Strategies by the South Carolina Secretary of State, and was received by ML Strategies on April 12, 2004. <u>See</u> Notice of Service of Process attached as Exhibit BB.

## Venue Is Appropriate In Massachusetts

56.    In my view, this dispute ought to be decided in Massachusetts because Noisette knew full well when it hired ML Strategies that ML Strategies was based in Massachusetts, that much of the work would be done in Massachusetts, and that it would be sued in Massachusetts if it did not pay what was owed under the Engagement Letter.

57.    Prior to executing the Engagement Letter, Noisette had entered into contracts with other consultants on the Project that contained a clause requiring all lawsuits to be brought in South Carolina. See Agreement for Services between Noisette and EQA Landmark Communities, LP dated April 1, 2001, ¶ 13, attached as Exhibit CC. However, Noisette never requested during its negotiations with ML Strategies that the Engagement Letter include any such clause. ML Strategies would not have agreed to any such clause.

58.    The main witnesses in this case are the persons who negotiated and signed the Engagement Letter, i.e., me, David Shapiro, Knott, and Noyes. It is at least as inconvenient for me and Shapiro to travel to South Carolina for this lawsuit as it is for Knott and Noyes to travel to Massachusetts. Indeed, it may be more convenient for Knott to travel to Massachusetts, as he did when he visited Nantucket and met with me in Boston in the late summer or early fall of 2002.

59.    The principal documents involved in the case are the Engagement Letter itself and Noisette's emails confirming that they would pay the Performance Bonus. These documents are obviously easily available to both parties. Even if this case were to require the use of documents concerning the underlying real estate transactions or regulatory issues on which ML Strategies provided assistance, most of those documents were provided to ML Strategies during the Engagement and are located in Massachusetts.

60.     The Mass. Complaint contains claims for relief under Massachusetts law, including a count for unfair and deceptive trade practices in violation of M.G.L. c. 93A, that are not pleaded in the SC Complaint.  These claims should be resolved by a court in Massachusetts.

61.     ML Strategies dealt fairly and openly with Noisette in trying to resolve this dispute without litigation, and in informing Noisette that it would file suit if a portion of the Performance Bonus were not paid by a certain date.  Noisette is punishing us for being up front about our intentions, by attempting (but failing) to race to the Courthouse in South Carolina ahead of us.  In my view, this action by Noisette is just the most recent example of Noisette's bad faith conduct throughout this matter, including its failure to pay the Performance Bonus which it repeatedly admitted was earned by ML Strategies, its invention of pretextual excuses for nonpayment, and its refusal to make payment unless ML Strategies agreed to a new contract at substantially reduced rates.

Signed under the pains and penalties of perjury this ___4___ day of May, 2004.

_____
Anthony G. Marken