UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ML Strategies, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-10641-RCL |
| | ) | |
| The Noisette Company, LLC | ) | |
| d/b/a Noisette Company, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## AFFIDAVIT OF DAVID K. SHAPIRO

I, David K. Shapiro, on oath depose and say as follows:

1.       I am Vice President of plaintiff ML Strategies, LLC ("ML Strategies"). I have

held this position since August 1998. I submit this Affidavit in support of ML Strategies'

Opposition to Defendant The Noisette Company, LLC's ("Noisette") Motion to Dismiss in this

case. I am fully familiar with and competent to testify to the facts set forth below.

2.       I have worked in ML Strategies' office in Boston throughout my tenure with the

company. I am a resident of Natick, Massachusetts.

3.       As Vice President of ML Strategies, I specialize in government relations, military

installations and aviation related consulting services. My work with numerous private sector

clients includes legislative and administration lobbying, military base redevelopment consulting,

and extensive work with a variety of airline and aviation sector companies. I also am responsible

for the ongoing oversight and management of ML Strategies. My duties include reviewing and

approving all engagements and engagement letters, monitoring accounts receivable, and managing the finances of the company.

4.      I worked with Tony Marken, ML Strategies' Vice President for Military Installations, in February 2002 to draft the Engagement Letter for ML Strategies' work on the Charleston Naval Shipyard project for the Noisette Company (the "Project"). ML Strategies agreed to accept a fee of $10,000 per month plus expenses, which was substantially less than our usual fee contemplated at $20,000 per month for such an engagement, in exchange for Noisette's promise to pay a performance bonus of $250,000 (the "Performance Bonus"). At that time, ML Strategies rarely agreed to compensation that was to be provided at the back end of an engagement or that was contingent in nature. After discussing the terms of the engagement with Stephen Tocco, Chairman and Chief Executive Officer of ML Strategies, I nevertheless approved the Performance Bonus concept on the Noisette Project because the client had indicated that it lacked the cash to pay our usual monthly fees, and I was confident that we could assist the client in obtaining its goal on the Project. I signed the Engagement Letter in Boston and mailed it from Boston to Noisette for its signature.

5.      During the course of the Engagement I met and spoke with Tony Marken on a regular basis to discuss strategy for moving the Project forward. Nearly all of these meetings and conversations took place at ML Strategies' office in Boston.

6.      At the end of 2002, it was my understanding that ML Strategies had earned the Performance Bonus under the terms of the February 14, 2002 Engagement Letter, and the only question was when we were going to get paid. I asked Tony Marken to keep raising this issue with Noisette.

2

7.      After the closing occurred in early July 2003 and we still had not been paid the

Performance Bonus, Tony Marken and I met on or about July 31, 2003 with Arthur Titus and

John Knott of Noisette in South Carolina to discuss a payment schedule. We agreed to the

following schedule: (a) $125,000 would be paid to ML Strategies on or before September 1,

2003; and (b) the remaining $125,000 would be paid to ML Strategies upon the final transfer of

the remaining land from the Navy to the City. Knott stated that Noisette recognized that ML

Strategies' contract was with Noisette, not the City, and that **whether or not the City assumed

the obligation, Noisette would make good on it**. Knott also indicated that he would like to

enter into a new consulting agreement with ML Strategies under the same terms ($10,000 per

month plus expenses) for additional related work on the Project.

8.      Noisette, however, continued to stonewall payment of the Performance Bonus.

By email dated September 15, 2003 (attached as Exhibit U), Knott sent an email to be forwarded

to Steve Tocco regarding the Performance Bonus. Knott mistakenly stated that ML Strategies

had agreed to a reduced fee of $125,000, which was incorrect. Knott further stated that "**the

performance payment of $125,000 is in principle understood**, we still do not have a firm date

or process with the City to accomplish" (emphasis added).

9.      By email dated October 7, 2003 (attached as Exhibit V), I replied to Knott's

September 15, 2003 email and reminded Knott that ML Strategies had not agreed to accept a

reduced Performance Bonus of $125,000, but rather had agreed to accept $125,000 of the

Performance Bonus now and defer payment of the remaining $125,000 until the remaining land

was transferred. I also asked Knott to clarify when the first $125,000 would be paid.

10.     Noisette then attempted to impose a new condition for payment of the

Performance Bonus that was not part of the parties' bargain, i.e., that ML Strategies continue to

3

provide services to Noisette at a substantial discount from the $10,000 monthly rate set forth in the Engagement Letter (which rate was substantially discounted from ML Strategies' usual rate in exchange for the Performance Bonus). On December 1, 2003, we forwarded to Noisette a draft engagement letter for a new contract. Noisette representatives indicated to us that the Noisette Board approved the new draft engagement letter at its December meeting.

11.    On December 30, 2003, Marken and I (in Boston) spoke with Titus by telephone. Titus acknowledged that ML Strategies had performed well under the initial Engagement and that Noisette needed ML Strategies in this continued effort. However, Titus insisted that ML Strategies reduce its monthly fee to $5,000-$6,000. I picked up the phone and had a private conversation with Titus. Titus acknowledged that $125,000 of the Performance Bonus was due and payable, but refused to commit to any payment schedule even for that portion of the bonus, despite my suggestion that leaving the bonus unresolved, coupled with the proposed reduced fee, could unravel our entire relationship. The entire phone call lasted approximately 1 hour and 45 minutes.

12.    On January 8, 2004, I had a further telephone call with Knott and Titus during which they once again acknowledged that Noisette owed the Performance Bonus to ML Strategies but could not commit to a payment schedule. I told them that the issue of the Performance Bonus needed to be resolved before the new contract could be discussed further. During this call Knott claimed, for the very first time, that ML Strategies had not performed its obligations under the Engagement Letter and that is why on July 31, 2003 Knott allegedly had agreed to pay only $125,000 of the Performance Bonus. It is my understanding that two days later, Titus called Marken in Boston and stated that (1) Knott was wrong in his position on ML Strategies' performance, and in fact Noisette would not be where they were without us, (2)

4

Noisette intended to honor the Performance Bonus although it could not commit to a schedule for payment, and (3) Noisette's Board of Directors was beginning to review Knott's handling of the matter, and this was part of the problem.

13.    Having received no payment of the Performance Bonus or any written commitment regarding the schedule on which it would be paid, we commenced efforts to collect the debt owed to us by Noisette. By letter dated March 19, 2004 Peter Biagetti, Managing Director – Firm Management for Mintz Levin, demanded payment of the Performance Bonus within seven days or the matter would be referred to outside counsel.

14.    By letter dated March 24, 2004, Noisette's attorney, W. Andrew Gowder, Jr., responded and asserted for the first time that the Performance Bonus was not earned by ML Strategies under the terms of the Engagement Letter because the property to be redeveloped was not actually transferred or conveyed from the City to Noisette prior to December 31, 2002. I am one of the authors of the Engagement Letter. The Engagement Letter does not require the property to be transferred or conveyed from the City to Noisette by December 31, 2002 in order for ML Strategies to earn its bonus, and it was never the parties' intention that there would be any such requirement. Until Mr. Gowder's letter, Noisette's position had always been that it lacked the cash to pay the bonus, not that the bonus had not been earned. I view this change of position as being made in bad faith and solely for purposes of escaping or deferring a liability that Noisette knows full well is due and owing to ML Strategies.

15.    It would be substantially inconvenient for me to travel to South Carolina in connection with any litigation of this matter.

5

Signed under the pains and penalties of perjury this ___4th___ day of May, 2004.

_____
David K. Shapiro